**REPORTED**

IN THE COURT OF SPECIAL APPEALS
OF MARYLAND

No. 2237

September Term, 2012

---

MARCUS LEE SMILEY

v.

STATE OF MARYLAND

---

Krauser, C.J.,
Matricciani,
Moylan, Charles E., Jr.
 (Retired, Specially Assigned),

JJ.

---

Opinion by Moylan, J.

---

Filed: January 29, 2014

Forfeiture by wrongdoing is a recent and, indeed, incongruous recruit to the ranks of the hearsay exceptions. Its energizing focus is not on the inherent trustworthiness of the hearsay declarant but on the inherent skulduggery of the hearsay opponent.

## An Enigmatic Factual Background

The appellant, Marcus Lee Smiley, was convicted in the Circuit Court for Wicomico County by a jury, presided over by Judge D. William Simpson, of the attempted murder in the first degree of Travis Green and related assault and handgun offenses. He was sentenced to a term of life imprisonment plus ten years.

There is an obvious back story linking the three leading characters in this criminal drama, but the trial record is frustratingly obscure as to what exactly that narrative thread might be. What we do know is that the appellant, Marcus Lee Smiley, was a drug dealer. We also know that the man he shot for no apparent reason, Travis Green, was also a drug dealer. What is missing is a motive.

As unenlightening as the trial testimony is, however, it will help to frame the appellate contentions that follow. At the time of the shooting, December 10, 2011, Travis Green had just spent the night at 729 Dennis Street in Salisbury, the home of Amanda Faulcon. Ms. Faulcon is the mother of Green's three young children, who live at that address with their mother. Just after arising, Green walked out the back door, stood on the back steps, and just looked around, while smoking a cigarette. At that point, he "observed this guy sitting on the next step, to the left." He was describing the "house next door to Amanda's, to the left, an abandoned house." Green said that he did not "know him

personally," but he identified that person in the courtroom as the appellant.  Green described

the appellant's behavior.

> Yeah, he was just sitting there, looking a little bogie, crazy, looking crazy and everything, I didn't pay it no mind, you know, when I went there before, in the past I've seen people sitting on that back step and I, you know, it was none of my business, I didn't pay him no mind.

Amanda then called Green back in the house as she knew that he was about to leave.

Green's truck was parked behind Amanda's house.  He went out the rear door and

approached the front of the truck.  As he did so, the person who had been sitting on the steps

next door came up to him and asked an innocuous question.  As Green opened the driver's

side door, that individual suddenly fired a shot at Green.

> Then that's when he was saying what <u>he said to me, Did you see where he went?</u>  And I looked back and I just, like, shook my head, like, you know, <u>I didn't know what he was talking about.</u>  <u>And then he fired a shot.</u>

(Emphasis supplied).

Green attempted to escape the fire by sliding across the front seat of the truck from

the driver's side to the passenger's side.  The shooting continued.

> A.  I jumped in the truck, as soon as I felt the shot to my arm I jumped in the truck to the, I tried to, you know, try to, I didn't know what he was, you know, what this guy was doing.

> Q.  <u>When you jumped in the truck, what did you try to do?</u>

> A.  <u>Slide out the passenger door, and I did</u>, but <u>he fired a shot</u> obviously over the, over the, you know, towards my way, <u>when I was trying to get out of the truck</u>, and I slid out, and I looked up and he was trying to put on his mask.  And I tried to dart, I had time enough to run back in the house from that point, from the, because you see in the truck, from the truck door the

- 2 -

back door was right there, but I didn't want to take a chance and run back in the house and this fool running behind me and my kids in there, and Amanda, so <u>I just kept on running beside the house.</u> And <u>I turned around</u>, I don't know why I turned around, <u>to see if he was still, if he was still behind me, and then came pow, pow, two more times.</u>

      Q. <u>How many times were you hit?</u>

      A. <u>Three times.</u>

      Q. <u>Where were you hit?</u>

      A. In my leg, my – well, <u>the first shot was my arm, my leg and my abdomen.</u>

(Emphasis supplied).

Green insisted that he did not know the appellant before that morning, but nonetheless said that he had "heard of him." During the encounter, the two men were within about five feet of each other. Green ran to the side of the house as two final shots were fired.

      A. I didn't go in the, I didn't go in the back, in the back door, <u>I ran to the side of the house. That's where the last two shots were fired into my body, and he ran off.</u>

      Q. Okay. So, just for clarification, you run this way –

      A. Right there, I made it right there.

      Q. And you're shot again here?

      A. Yes. I looked back and <u>he was right behind me, he was on my heels.</u>

(Emphasis supplied).

After the appellant's gun was empty, Green sought some explanation for the shooting, but the appellant fled the scene without answering.

Q. Did the Defendant ever ask you for anything at all?

A. No.  I asked him.  On the side of the house, what, what, you know, what is it, a robbery?  What is this about, money?  What is this about?

Q. Did he say anything?

A. No.

Q. At what point did that occur?  When did you ask him that?

A. On the side of the house.

Q. Okay.

A. Yeah.

Q. As you were running?

A. Yeah.  No, not while I was running, after he fired the last shot, I said, boy, what you keep shooting me for?  He kept clicking the gun, you know, it wasn't no more bullets left in it, I said what are you still trying to shoot me for, what is this about, money?  I'm asking, right?

Q. Did he answer?

A. No, he just took off after.

(Emphasis supplied).

Amanda drove Green to the hospital.  Green next remembers waking up in the Shock Trauma Unit of the University of Maryland Hospital in Baltimore, where he remained for

five days.  He had had a conviction in federal court for possession of crack cocaine and at the time of the shooting was apparently working in cooperation with federal drug authorities.

The entire confrontation between the appellant and Travis Green was witnessed by Elmer Duffy.  On December 13, 2011, three days after the shooting, Elmer Duffy gave a statement about what he had observed.  That statement was recorded and transcribed and subsequently introduced into evidence.

On the morning of December 10, 2011, Duffy had arrived to do some house painting at the vacant house immediately adjacent to Amanda Faulcon's home at 729 Dennis Street.  Duffy knew the appellant from their frequent playing of basketball together some years earlier.  Duffy also knew the appellant's mother and his sisters.  When Duffy first saw the appellant standing in the driveway, the two greeted each other.

> So I spoke to him, "Hey, Mark."  He said, "Hey, Elmer."  And I went on in the house.  When I went in the house, I let the blinds up so I could see what he be doing[.]

(Emphasis supplied).

Duffy then described the shooting scene itself.

> A       He [Travis Green] stood there at that back door and looked around.  Then when he came off that back stoop, he walked around the back side of his vehicle, opened this door up –
>
> Q       Okay.
>
> A       – and when he got in, I look and there was Mark running.
>
> Q       Okay.  So –

A        Running towards him.

Q        The guy that come out of the house went to the driver's side of the –

A        He went around the back of his vehicle, then got into the driver's side.

Q        Open the driver – okay.

A        And once he got in the driver's side, I looked and Mark was running towards that vehicle coming up from the back side.

Q        Okay.  From where he was standing?

A        From where he was standing.  So that means he came up in the back of the vehicle.

Q        Okay.

A        And he ran around on this side, opened that door and just pow, pow, pow, pow, pow, and I was, like – I'm standing to the window, and I'm, like, damn.  I figured the guy was dead, so help me God.  Some kind of why he jumped out on this side –

Q        Okay.

A        – on the ground –

Q        Come out the passenger's side on the –

A        Come out the passenger's side on the – and jumped on the ground.  Mark came around the front side of the vehicle and like he was trying to shoot him again.  And what made me think that that guy was shooting back at Mark was because Mark was ducking.  Do you understand what I'm saying?

Q        Right.

A        When he ran around this side to try to shoot the guy, he ducked and ran back to this side.  Then the guy got up off the ground, and then I don't

- 6 -

know if he shot at Mark or Mark shot him again, then he bust in the back door.  Then when he bust in the back door, like, Mark shot a couple more times.  And then when Mark come running back this a way[.]

(Emphasis supplied).

Elmer Duffy did not testify at the appellant's trial on October 10, 2012, for the obvious reason that he was murdered on February 20, 2012.  The introduction into evidence of his recorded statement to the police is the most noteworthy of the contentions before us.

Ironically, the testimony of the appellant himself helped to fill in what otherwise might have been arguable gaps in the State's case.  The appellant placed himself right at the scene of the crime at approximately 8:30 a.m. on December 10, 2011.  The appellant testified that he went to the area, specifically to a Richard Blake's house, because he "had some furniture that needed to be taken to Delmar Recycling."  Richard Blake's house was next door to the house where Elmer Duffy was to do some painting.  Elmer Duffy arrived in the area about 15 minutes after the appellant got there.  The two men, who knew each other, conversed for a time.  At that point, two of the appellant's "associates" came up and inquired of the appellant if he knew where they could get some drugs.  "Associates" means buyers of narcotics and "anything" means narcotic drugs.

> A    Well, like I said, Mr. Duffy pulled up, and then I had two friends that come to me, associates that came to me and asked me did I know anybody that had anything.  I said no, I don't know nobody got anything because –
>
> Q    What does that mean, had anything?
>
> A    Talking about drugs.

(Emphasis supplied).

In his further testimony, the appellant elaborated:

THE WITNESS: Like I said I had two associates who come up, approached me, asked me did I know anybody who had anything as far as –

BY [DEFENSE COUNSEL]:

Q      Mr. Smiley, what does that mean?

A      Drugs.

Q      And what do you mean by associates?

A      Well, two guys that I knew. Not friends but ...

Q      Not friends?

A      People that I associate with.

Q      Okay. And they came up, and what did you do after they came up?

A      Well, like I said, they asked me did I know anybody that had anything.

(Emphasis supplied).

From that point on, the appellant took up the cause of getting his associates some drugs, as he took the associates' purchase money.

THE WITNESS: Okay. Well, what I did next was, I took the money that he had given me, I took the money, and I was in the process, like I say he asked me did I know anybody had anything, I said no, I don't know anybody have anything. He said, well, he knows Travis[.]

(Emphasis supplied).

Even if the appellant and Travis Green were not close acquaintances, the appellant knew that Travis Green sold drugs. The appellant waved to Green, called him by name, and ran in his direction in an effort to purchase drugs.

> I ended up going towards Mr. Green. I had about, about, the house was about 40 to 50 yards away, and I went to Mr. Green. And I didn't know him, I was just going to him, and as I was going to him I waved my hand in the air like this, I was asking him, I said Travis, I'm trying to get something, I'm trying to get something. And he looked at me like I'm crazy, and I'm looking at him like he's crazy, because we didn't know each other. We didn't know each other. And I said I'm going to, I'm running to him trying to buy something, trying to get some drugs, and in the process of me running to him I get about a good, like I said, a good about 40, 50 yards away from him, and when I get about a good 25 to 30 yards away, and he said –
>
> ....
>
> As I was getting closer to Travis, about 15 yards away, and he's standing, he's standing on the back porch, he's standing on the back porch, and as though he's talking to somebody in the driveway, and like I said, as I'm running towards him saying, I'm trying to catch him before he leaves, and I'm trying to, trying to say I want to get something from him. And in the process, like I said, somebody, he act as though he's talking to somebody in the driveway. And as I get to about, a good ten yards away from him, I see this person in all black, with a black ski mask on, he jumps in between the house, I hear two shots. When I heard two shots, I immediately hit the ground. I stayed on the ground about a good five to eight seconds. I look up, I don't see Travis on the back porch anymore.

(Emphasis supplied).

But for the sudden appearance of the mysterious masked gunman, the appellant essentially corroborated the versions of events given by both Travis Green and Elmer Duffy. The appellant's placing of himself at the scene of the crime and his acknowledgment that, to some extent at least, he knew Green certainly dispel any lingering doubt about the

- 9 -

reliability of Green's photographic identification of the appellant. The fact that the appellant

knew Green, moreover, gives rise to a permitted inference that Green knew the appellant.

## The Contentions

The appellant raises three contentions.

1.      He contends that at a pretrial hearing on September 27, 2012, Judge Leah J. Seaton erroneously ruled that the out-of-court declaration of Elmer Duffy, who was unavailable as a witness because he had been murdered, was admissible via an exception to the rule against hearsay, Maryland Rule 5-804(b)(5)(B) and Courts and Judicial Proceedings Article, § 10-901;

2.      He contends that at a pretrial hearing of June 8, 2012, Judge W. Newton Jackson, III, erroneously failed to suppress the victim, Travis Green's, extrajudicial identification of him from a photographic array; and

3.      He contends that at trial Judge Simpson erroneously excluded testimony by his proposed expert witness on the frailties of eyewitness memory and identification.

## The Doctrine Of Forfeiture By Wrongdoing

Happily, all parties are in full agreement on one thing. Elmer Duffy was unavailable

as a witness on October 10, 2012 because Elmer Duffy had been murdered on February 20,

2012. His out-of-court declaration to the police of December 13, 2011 was quintessentially

hearsay when proffered in evidence in lieu of his live appearance. The State nonetheless

sought to qualify it as an exception to the Rule Against Hearsay pursuant to Maryland Rule

5-804(b)(5)(B), which provides:

(b)    **Hearsay exceptions.** The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

....

(5)     *Witness unavailable because of party's wrongdoing.*

....

(B)     Criminal causes.  In criminal causes in which a witness is unavailable because of a party's wrongdoing, admission of the witness's statement under this exception is governed by Code, Courts Article, § 10-901.

Although Rule 5-804(b)(5)(B), effective as of January 1, 2006, now masquerades as a typical hearsay exception, it is, in its essential nature, something quite different. Like many hearsay exceptions, it is, of course, dependent on necessity, to wit, upon the unavailability of the live witness.  Unlike most other exceptions, however, its complementary raison d'être is not the reliability of the assertion.  Its animating rationale, rather, is a policy position that the opponent of a hearsay declaration will not be permitted to profit from his own wrongdoing in procuring the absence of the declarant as a witness.

Although the provenance of the principle goes deep into Anglo-American common law, its current prominence is as a collateral consequence of the Supreme Court's watershed decision of Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).  The Supreme Court's decision was that an out-of-court declaration that is "testimonial" in nature cannot escape the rigors of the Confrontation Clause even if it otherwise qualifies as an exception to the Rule Against Hearsay.  With Crawford, therefore, much of the typical prosecutorial arsenal was rendered useless.  As alternative solace, the prosecution turned to the venerable, but theretofore largely neglected, principle of forfeiture

by misbehavior. If the unavailability of a witness is a result of a misdeed by a criminal defendant, that defendant is deemed to have forfeited any right to use the Confrontation Clause to bar even a testimonial out-of-court declaration by the missing witness.[1] The switch in prosecutorial tactics was immediate and nationwide.[2]

In <u>Davis v. Washington</u>, 547 U.S. 813, 833, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006), the Supreme Court reaffirmed and elaborated on the doctrine of forfeiture by wrongdoing:

---

[1] The <u>Crawford</u> opinion itself, 541 U.S. at 62, explained:

> [T]he rule of forfeiture by wrongdoing (which we accept) extinguishes confrontation claims on essentially equitable grounds; it does not purport to be an alternative means of determining reliability.

(Emphasis supplied).

[2] Professor Byron L. Warnken, "'Forfeiture by Wrongdoing' After <u>Crawford v. Washington</u>: Maryland's Approach Best Preserves the Right to Confrontation," 37 <u>U. Balt. L. Rev.</u> 203, 229 (2008) (hereinafter "Warnken"), described this shift in prosecutorial tactics:

> [P]ost-Crawford, the doctrine of forfeiture by wrongdoing has assumed greater importance in evidentiary battles over admissibility of hearsay statements by unavailable, out-of-court declarants. Prior to <u>Crawford</u>, when the <u>Roberts</u> test controlled, a prosecutor needed only to persuade the trial court of the reliability of a statement as a condition of its admission. <u>After Crawford, prosecutors must rely much more heavily on the forfeiture doctrine and must demonstrate that the defendant procured the unavailability of the witness.</u>

(Emphasis supplied).

- 12 -

[W]hen defendants seek to undermine the judicial process by procuring or coercing silence from witnesses and victims, the Sixth Amendment does not require courts to acquiesce. While defendants have no duty to assist the State in proving their guilt, they do have the duty to refrain from acting in ways that destroy the integrity of the criminal-trial system. We reiterate what we said in Crawford: that "the rule of forfeiture by wrongdoing ... extinguishes confrontation claims on essentially equitable grounds." That is, one who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation.

(Emphasis supplied).

The Supreme Court itself had applied the doctrine of forfeiture by wrongdoing as far back as Reynolds v. United States, 98 U.S. 145, 158, 8 Otto 145, 25 L. Ed. 244 (1878):

The Constitution gives the accused the right to a trial at which he should be confronted with the witnesses against him; but if a witness is absent by his own wrongful procurement, he cannot complain if competent evidence is admitted to supply the place of that which he has kept away. The Constitution does not guarantee an accused person against the legitimate consequences of his own wrongful acts. It grants him the privilege of being confronted with the witnesses against him; but if he voluntarily keeps the witnesses away, he cannot insist on his privilege. If, therefore, when absent by his procurement, their evidence is supplied in some lawful way, he is in no condition to assert that his constitutional rights have been violated.

(Emphasis supplied).

The doctrine is, indeed, traced as far back as Lord Morley's Case, 6 How. St. Tr. 769, before the House of Lords in 1666. See also 6A Lynn McLain, Maryland Evidence, § 804(5), "When Declarant's Unavailabity Is Obtained By Wrongdoing of Opponent Of Hearsay" (3d ed. 2013); Joseph F. Murphy, Jr., Maryland Evidence Handbook, § 805(A)(1), "Forfeiture by Wrongdoing" (3d ed. 1999, 2008 Cum. Supp.). In the wake of Crawford v.

- 13 -

Washington, however, this theretofore modest equitable doctrine took on a far greater significance.

Giles v. California, 554 U.S. 353, 128 S. Ct. 2678, 171 L. Ed. 2d 488 (2008), completed the trilogy of Supreme Court opinions dealing with forfeiture by wrongdoing. In fine-tuning the doctrine, Giles stands for the unremarkable proposition that it is not enough that the wrongdoing of the defendant shall actually have caused the unavailability of the witness. It is further required that the wrongdoing have been perpetrated for the purpose of causing the witness to be unavailable. It is a specific-intent doctrine. In Giles, the wrongdoing had been Giles's murder of his ex-girlfriend, who thereby became the unavailable witness. Giles's testimony, however, had been that, in the course of a hot-tempered struggle, he had killed the ex-girlfriend in self-defense. The California court required no showing of an intent to make the victim unavailable as a witness. It was for ignoring that critical element that the Supreme Court reversed.

> The state courts in this case did not consider the intent of the defendant because they found that irrelevant to application of the forfeiture doctrine. This view of the law was error, but the court is free to consider evidence of the defendant's intent on remand.

554 U.S. at 377 (emphasis supplied).

Two excellent analyses of the prosecutorial response to Crawford's new interpretation of the Confrontational Clause are Warnken, 37 U. Balt. L. Rev. 203, and Paul W. Grimm and Jerome E. Deise, Jr., "Hearsay, Confrontation, and Forfeiture By Wrongdoing:

Crawford v. Washington, A Reassessment of the Confrontation Clause," 35 U. Balt. L. F. 5 (2004) (hereinafter "Grimm").

In the case now before us, by dramatic contrast, this intent or motivation element poses no remote problem. The two intercepted telephone calls from the appellant sending the word to his nephew to eliminate Duffy emphatically proclaim the appellant's purpose and intent of "mak[ing] sure that boy don't come to court."

Maryland's quick response to Crawford v. Washington and to the new battlefield conditions manifested itself within the year in Chapter 446 of the Acts of 2005, effective October 1, 2005, now codified as Maryland Code, Courts and Judicial Proceedings Article, § 10-901:

> § 10-901. **Admission of statement in a criminal case.**
>
> (a) *In general*. – During the trial of a criminal case in which the defendant is charged with a felonious violation of Title 5 of the Criminal Law Article or with the commission of a crime of violence as defined in § 14-101 of the Criminal Law Article, a statement as defined in Maryland Rule 5-801(a) is not excluded by the hearsay rule if the statement is offered against a party that has engaged in, directed, or conspired to commit wrongdoing that was intended to and did procure the unavailability of the declarant of the statement, as defined in Maryland Rule 5-804.
>
> (b) *Hearing*. – Subject to subsection (c) of this section, before admitting a statement under this section, the court shall hold a hearing outside the presence of the jury at which:
>
> > (1) The Maryland Rules of Evidence are strictly applied; and
> >
> > (2) The court finds by clear and convincing evidence that the party against whom the statement is offered engaged in, directed, or conspired to commit the wrongdoing that procured the unavailability of the declarant.

(c) *Exceptions*. – A statement may not be admitted under this section unless:

    (1)  The statement was:

        (i)  Given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding or in a deposition;

        (ii)  Reduced to writing and signed by the declarant; or

        (iii)  Recorded in substantially verbatim fashion by stenographic or electronic means contemporaneously with the making of the statement; and

    (2)  As soon as is practicable after the proponent of the statement learns that the declarant will be unavailable, the proponent notifies the adverse party of:

        (i)  The intention to offer the statement;

        (ii)  The particulars of the statement; and

        (iii)  The identity of the witness through whom the statement will be offered.

(Emphasis supplied).

## Colkley v. State

The first and only Maryland appellate case on the forfeiture by wrongdoing doctrine was Colkley v. State, 204 Md. App. 593, 42 A.3d 646 (2012), rev'd on other grounds, 432 Md. 650, 69 A.3d 1104 (2013).  Colkley actually dealt with two separate and completely unrelated invocations of the forfeiture doctrine, an unsuccessful invocation by the defense and a successful invocation by the State.

At an earlier trial, a witness had given some marginally helpful testimony for the defendant.  That witness, however, was unavailable for the defendant's retrial because of an intervening conviction for perjury.  The defendant blamed the State for having brought about that unavailability by that conviction.  The defendant's invocation of the forfeiture

doctrine, however, was twice-curst. In the first place, the State's legitimate and successful perjury prosecution was not a wrongdoing. In the second place, there was no remote showing that the perjury prosecution had been undertaken for the purpose of making the witness unavailable. That fatal lack of intent was a straightforward application of Giles v. California.

The second invocation of the forfeiture doctrine was by the State and it was successful. It bore a striking resemblance, moreover, to the case now before us. A 17-year-old co-defendant gave a taped statement to the police shortly after his arrest, implicating the defendant Colkley. Colkley learned of that fact and subsequently, from jail, made telephone contact with two separate confederates. One of them testified for the State and described Colkley's conversation with him.

> [Colkley] at that point was telling me that the case ... the State had against [him] was weak. The only thing, the only place where they had any type of strength that came from their case was from the kid [the 17-year-old]. He supposed to make a tape for the State. He told the State law enforcement about the whole incident and it was recorded. ... [H]e was telling me that they had to get rid of [the 17-year-old] because without [the 17-year-old] they won't have no case.

204 Md. App. at 635 (emphasis supplied).

Several hours later, the 17-year-old was shot and killed. One of Colkley's confederates, who paid for several contract killings in the course of the larger case, was introduced to and paid a theretofore unknown "hit man" for the killing of the 17-year-old potential witness. The trial judge found the following:

> [T]he State has established by clear and convincing evidence that Mr. Colkley engaged in, directed or conspired to make, to commit wrongdoing that was intended to and in fact did cause [the 17-year-old] to be unavailable.

Id. at 637-38. This Court affirmed that finding and ruling.

> [The] conspiracy unquestionably included the ... necessary coverup of preventing detection by police and use by the prosecution, <u>as particularly evidenced by Colkley's telephone conversation with Horsey on July 9, 2003, that "they had to get rid of [the 17-year-old] because without [the 17-year-old], they won't have no case."</u>

Id. at 638 (emphasis supplied).

### The Appellant's Forfeiture By Wrongdoing

As Professor Warnken pointed out, 37 <u>U. Balt. L. Rev.</u> at 204, the Maryland procedure for applying the forfeiture by wrongdoing doctrine is the most defense-oriented in the nation:

> Maryland is the only jurisdiction that takes a defense-oriented, pro-confrontation position on <u>all three major components of a "wrongdoing" determination</u>, requiring: <u>(1) a hearing, (2) strict rules of evidence, and (3) clear and convincing evidence of wrongdoing.</u>

(Emphasis supplied). Section 10-901, moreover, limits the availability of forfeiture by wrongdoing to a limited category of crimes – to narcotics offenses under Title 5 of the Criminal Law Article and to crimes of violence pursuant to Section 14-101 of the Criminal Law Article.

This appellant received the full benefit of every one of Maryland's heightened standards. There was no question about Elmer Duffy's unavailability on October 10, 2012. He had been murdered on February 20, 2012. In compliance with Courts and Judicial

Proceedings Article, Section 10-901(a), the appellant was on trial for a crime of violence under Criminal Law Article, Section 14-101(a)(7) "murder," and (a)(15) "an attempt to commit any of the crimes described in items (1) through (14) of this subsection."

Before finding a forfeiture by wrongdoing, Maryland, unlike the majority of American jurisdictions, requires a hearing. The appellant received a full two-day hearing before Judge Leah J. Seaton on September 27 and October 1, 2012. Maryland, unlike most American jurisdictions, requires that the hearing judge be persuaded of the wrongdoing by clear and convincing evidence. In rendering her decision on October 1, 2012, Judge Seaton expressly made her finding according to that heightened standard of persuasion.

> Under 10-901, <u>the Court finds by clear and convincing evidence</u> that the defendant engaged in, directed or conspired to commit the wrongdoing that procured the unavailability of Mr. Duffy.

(Emphasis supplied). Section 10-901(b)(1) further directs that the Maryland Rules of Evidence be strictly applied. We have scanned every line of the two-day hearing before Judge Seaton and find not a murmur of objection or protest to any evidentiary ruling or hearing procedure.

### A Burden of Persuasion Is Not a Burden of Production

Maryland's enhanced level of persuasion is worthy of some comment, for the appellant apparently reads something into it that is not there. In brief and argument, he solemnly intones the phrase "by clear and convincing evidence," as if it were a mantra having a critical bearing on the issue before us. It is not. Burdens of persuasion are simply guidelines to

factfinders as to the level of certainty they should feel before arriving at a conclusion on a particular issue.[3]  As a matter of law, a jury should be instructed as to the proper burden of persuasion.  As a matter of law, the factfinding judge must arrive at certain conclusions using the proper burden of persuasion.  Beyond that, however, the burden of persuasion deals only with matters of fact and its application by the factfinder to a particular set of facts is not a matter of law.

When we at the appellate level are assessing legal sufficiency with regard to the burden of production, we assume maximum credibility and maximum weight, which is something the hearing judge does not do.  He must be persuaded, whereas we need not be.  Once the burden of production has been satisfied, that quantum of evidence that could persuade one factfinder by a bare preponderance of the evidence could persuade a second factfinder clearly and convincingly and could persuade yet a third factfinder beyond a reasonable doubt.  The burden of production, which is our only concern on appeal, does not

---

[3]The very concept of different levels of persuasion is an elusive one.  Perhaps the most effective communication of what is meant by "burdens of persuasion" was that suggested by Professor J.P. McBaine in his article, "Burden of Proof:  Degrees of Belief," 32 Cal. L.R. 242, 246-47 (1944).  He explained that (a) belief by a bare preponderance,  (b) a clear and convincing belief,  and (c) belief beyond a reasonable doubt about whether a particular event has happened are simply respective levels of assurance that the event in question "(a) probably has happened ... (b) ... highly probably has happened, or (c) ... almost certainly has happened."  (Emphasis in original).  It is a psychological measurement, not a legal measurement.  See also In Re Winship, 397 U.S. 358, 369-75, 90 S. Ct. 1068, 25 L. Ed. 368 (1970) (Harlan, J., concurring); Kaplan, "Decision Theory and the Factfinding Process," 20 Stan. L. Rev. 1065, 1071-77 (1968).

rise or fall with the burden of persuasion.  Nor does the imposition of a heightened burden of persuasion imply the imposition of a heightened burden of production.

This is not to say that the Maryland General Assembly's decision to heighten the burden of persuasion is not significant.  It is very significant.  It makes the proving of forfeiture by wrongdoing more difficult in Maryland than it is in most states and in the federal courts, which are content to rely on the bare preponderance level of persuasion.  All we are saying is that Maryland's heightening of the burden of persuasion has its impact at the trial level, where the factfinding judge must apply that heightened standard to himself, but not at the appellate level, where persuasion is not a concern.  The place for the appellant's rhetorical intoning of the mantra, therefore, was before the hearing judge, not before us.  It is a very important factor in its proper context, but the defense must not take it out of that context and attempt to turn it into a measure of legal sufficiency at the appellate level.

In any event, Judge Seaton correctly applied Maryland's enhanced level of persuasion to herself and her ultimate findings and ruling were in strict compliance with that enhanced standard.

## A Critical Mission For a Nephew

Elmer Duffy gave his recorded statement to the police on December 13, 2011.  The word apparently spread quickly, for on December 14, the appellant, albeit in jail, was aware that Duffy was telling people that he had seen the appellant as the person involved in the shooting of Travis Green.  The first of two intercepted telephone calls that the appellant

made from the Wicomico County Detention Center was to his mother at 9:46 a.m.  Through

his mother, the appellant was passing on the unmistakable message to his nephew, Heathcliff

"Keith" Parker, to get Elmer Duffy "out of the picture."

MR. SMILEY: ... But let – <u>let Heathcliff</u> – Heathcliff [Smiley's nephew] and Kev and them <u>know that the boy who lives across the street from Kevin, Elmer Duffy, was a witness.</u>  He – <u>he told people he seen me standing outside and he seen me running with the gun</u> and all that stuff.

....

<u>Elmer ... Elmer Duffy, the boy that lives across the street from Kevin,</u> Mom.  <u>The boy that lives across the street from Kev.</u>

....

<u>You see that boy Elmer, get him out of the picture.</u>  You know, <u>I don't want that stuff.</u>  I ain't trying to go out like that, Mom.

....

But yeah, Mom.  Tell Kevin, like I said, I'm going to put him on the visiting list.

MOTHER: They'll be over.  Put them down.

MR. SMILEY: I'm going to put them on.

....

MR. SMILEY: Just tell Kim I said – just make sure you tell Kim, Mom, that I said <u>make sure they take care of that.</u>

MOTHER: All right.

MR. SMILEY: <u>You know what I'm talking about?</u>

....

MR. SMILEY: <u>Make sure he take care of everything, Mom, what I'm talking about. You know what I'm talking about</u> –

MOTHER: All right.

(Emphasis supplied).

The second telephone call from the appellant that was intercepted that same morning was to an unidentified female. The same urgent message was to tell Heathcliff not to let Elmer Duffy "come to court."

MR. SMILEY: Come on, man. <u>And the guy that lives right across the street, this boy named Elmer</u> – you hear me?

MS. SPEAKER: Uh-huh.

MR. SMILEY: <u>The guy named Elmer</u>, <u>he's the one that lives across from me</u> – <u>lives across from Kev.</u> He said – <u>he the one that saw everything. He saw me shoot the boy. He saw me chase the boy down. He saw me pull the mask down, saw me pull the mask back up.</u> Oh man. <u>He saw all this,</u> doggone, then why didn't he report the crime in the very beginning?

MS. SPEAKER: Uh-huh.

....

MR. SMILEY: ... <u>I think Heathcliff's number is [redacted] Take that number down, too. [Redacted].</u>

MS. SPEAKER: Okay.

MR. SMILEY: Okay. <u>And tell him that</u> I said, man, <u>make sure that he don't – he don't come to court</u>, man.

MS. SPEAKER: Okay.

MR. SMILEY: And <u>make sure they don't – do you know what I mean?</u>

MS. SPEAKER: Yeah.

....

MR. SMILEY: ... I said, tell everybody I said I love them, and <u>make sure – make sure that Kevin and them take care of what I asked them to take care of.</u>  Tell Kev I said <u>make sure he get on top of that.</u>  <u>Make sure that boy don't come to court.</u>  <u>Make sure he don't – he don't –</u>

MS. SPEAKER: Yeah.

(Emphasis supplied).

Under Section 10-901, the proof of wrongdoing in this case requires proof of two different elements – the effective <u>actus</u> <u>reus</u> of murdering Elmer Duffy and the effective <u>mens</u> <u>rea</u> of doing so with a particular specific intent, to wit, the intent to prevent Elmer Duffy from testifying.  These two intercepted telephone calls from the appellant supply the motivation and the specific intent to get rid of Elmer Duffy as a witness <u>par</u> <u>excellence</u>.  In terms of intent, no more could be asked for.

### The Unavailability of Elmer Duffy

At his own trial, Heathcliff Parker may be cloaked in a mantle of innocence, but he is not so grandly garbed on a threshold issue at someone else's trial.  On the question of the State's Section 10-901 motion, the evidence showed 1) that the appellant ardently and insistently sent word to his nephew to get rid of Elmer Duffy, 2) that Elmer Duffy was subsequently murdered, 3) that the appellant jubilantly reacted to the news of the murder, and 4) that nephew Heathcliff Parker was, indeed, then charged with that murder.  On that

- 24 -

evidence, Judge Seaton found that the appellant was involved in procuring the unavailability of Elmer Duffy as a witness. We cannot say that she was clearly erroneous.

At the hearing on the motion, defense counsel made a passing allusion to the worthlessness of an arrest or an indictment as evidence of guilt. The predominant theme of counsel's argument, however, was that the State had failed to show that Heathcliff Parker had actually been charged with Elmer Duffy's murder. The refrain was repetitive that no indictment had been introduced. The full record, however, was not so bereft. In announcing her ruling, Judge Seaton ruled:

> The Court takes judicial notice of the case file in this court, Case Number K12-0587 in which the murder charges are pending against Mr. Parker.

In the State's Notice of Intent to Introduce the Recorded Statement of Elmer Duffy, filed on August 9, 2012, the State had alleged, inter alia, that:

> Keith Parker, the nephew of the above captioned defendant, has been charged with the murder of Elmer Duffy.

In his Memorandum in Support of Opposition to State's Notice of Intent to Introduce the Recorded Statement of Elmer Duffy, filed on September 21, 2012, the appellant, moreover, listed, among the Facts of the case:

> On February 20, 2012, Duffy was killed.
>
> Keith Parker ("Parker"), nephew of the Defendant, was charged with murder and conspiracy to commit the murder of Mr. Duffy on July 23, 2012. The conspiracy charge alleges that Parker conspired with the Defendant to commit the murder of Duffy, but the Defendant has not yet been charged in Duffy's murder.

- 25 -

(Emphasis supplied).

## An Indictment Is Not Without Evidentiary Significance

A defendant may enjoy the presumption of innocence at his own trial, but that presumption does not attend him in all other contexts. A voter may vote against an otherwise qualified candidate just because the candidate has been indicted for election fraud or for any other crime. A parent may discontinue hiring a babysitter who has only been indicted for child abuse. A bank may choose not to hire an otherwise qualified applicant just because he has been indicted for embezzlement. These perfectly rational decisions do not offend the presumption of innocence. Indictments have significance and they are given significance, except at the criminal trial of the person indicted.

An indictment, moreover, may pack more persuasive punch than an arrest by a policeman. Quantitatively, to be sure, probable cause remains probable cause remains probable cause, but successive findings of probable cause by an escalating set of probable cause assessors is not without a particular type of significance. Inevitably, adding to the mix the confirmation by the hearing judge, Gerstein v. Pugh, 420 U.S. 103, 95 S. Ct. 854, 43 L. Ed. 2d 54 (1975), and then the reconfirmation by the Grand Jury enhances persuasion even if it does nothing to enhance production. Aside from several very general guidelines, persuasion is not a subject that can be reduced to rules and measurements. The things that may persuade a factfinder are very personal and idiosyncratic. The appellant discounts this truism.

The rigors that the appellant would attach to the evidentiary hearing are unrealistic. Proof of an excited utterance, for instance, does not demand a psychiatrist to establish distraught emotion clearly and convincingly nor does a dying declaration insist on a priest administering last rites to establish the expectation of imminent death on the part of the declarant beyond a reasonable doubt. An evidentiary hearing is not a trial on guilt or innocence. Those evidentiary qualifiers for hearsay exceptions are peripheral issues and not an ultimate verdict. There is another obvious impediment to what the appellant proposes. It would be absurd to hold that the appellant's pretrial hearing on the hearsay issue in this case could not move forward until Parker's trial for murder had been concluded. It would be equally absurd to hold that Parker's guilt of murder would have to be proved at the appellant's evidentiary hearing as a veritable trial within a trial or, in this case, a veritable trial within a pretrial hearing. Parker's indictment for murder was admissible evidence at the evidentiary hearing to help show the appellant's involvement in procuring the witness's unavailability.

We repeat that we are venturing no opinion on what might or might not be admissible at the actual trial of Parker for the murder of Elmer Duffy. That would be a different context entirely. Our concern is only with the significance of that piece of evidence at a hearing before the judge alone with no question about the counterweight of possible prejudice to a jury. Where the evidentiary issue was whether the appellant played some role in the death of Elmer Duffy and where the appellant had sent clear direction, through two different

- 27 -

intermediaries, to his nephew to get rid of Elmer Duffy, the subsequent indictment of that

nephew for the murder of Elmer Duffy was not without relevance.[4]

## Judge Seaton's Ruling

At the conclusion of the hearing, Judge Seaton considered all of the facts before her

and made the following ruling:

> The State's Notice of Intent to submit the recorded statement of Elmer Duffy was opposed by the defendant. Section 10-901 of Courts and Judicial Proceedings governs the admissibility of the recorded statement. The Court has considered the State's notice, the defendant's opposition and supplemental filing and oral arguments, admitted exhibits, the testimony of Mr. McFarland, and the recorded statement and transcript of that conversation which accurately reflected the conversation.

> Under 10-901, the Court finds by clear and convincing evidence that the defendant engaged in, directed or conspired to commit the wrongdoing that procured the unavailability of Mr. Duffy. Mr. Duffy was murdered. Keith Parker has been charged with that murder.

> The Court finds ... Mr. McFarland's testimony about the defendant's statements and his reaction to the news of Mr. Duffy's murder to be credible.

> In addition, the Court notes that in the conversation with his mother, the defendant wanted to, quote, "get Mr. Duffy out of the picture," end quote. He also tells – well, the quote part is "out of the picture." He also tells his

---

[4]Although the information was not before Judge Seaton, of course, at the time of the hearing on September 27 and October 1, 2012, we note that on January 25, 2013, the nephew, Keith Parker, entered an Alford plea of guilty, pursuant to North Carolina v. Alford, 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970), to the murder in the second degree of Elmer Duffy. The trial judge heard the State's recital of the evidence and ruled that it adequately supported the plea. Although, pursuant to Alford, Parker did not expressly acknowledge murdering Elmer Duffy, he accepted a prison term of 25 years on the strength of the State's case that he had murdered Elmer Duffy. We have to wonder why the appellant would even want a remand on this issue or what purpose it could possibly serve.

mother at the end of the conversation, quote, "make sure they take care of everything, Mom.  I'm talking about, you know what I'm talking about." Period end quote.

The Court takes judicial notice of the case file in this court, Case Number K12-0587, in which the murder charges are pending against Mr. Parker.  It is not persuaded by counsel's argument that the State has not proven the wrongdoing, nor that the State has failed by clear and convincing evidence to establish that the defendant engaged in, directed or conspired to commit the wrongdoing that procured the unavailability of Mr. Duffy.

The Court has also considered the defense's argument that Section 10-901 violates the Federal Constitution and the Maryland Declaration of Rights. After reviewing the case law and the statute, the Court is not persuaded by these arguments.

The State's notice of intent to introduce Mr. Duffy's statement is granted.  The defendant's opposition is denied.

(Emphasis supplied).  We see no error in that ruling.

## The Fringe Issue of Identification

The appellant's two remaining contentions both concern identification law.  They seem, however, to be largely an academic exercise because identification ironically does not figure as a significant issue in this case.  The appellant himself testified that he was present at both the scene of the crime and the time of the crime.  He testified that he knew Elmer Duffy and conversed with him at the scene.  He testified that he was attempting to buy drugs from Travis Green and that he ran up to him and called him by name at the scene.  The appellant, to be sure, parts company with Travis Green and Elmer Duffy in that his narrative includes a mysterious masked gunman who suddenly appeared on center stage, like a deus ex machina, and started firing shots at Travis Green.  Despite that dramatic glitch in the plot

- 29 -

line, the appellant's story does not resemble that of the typical innocent who is miles away and yet finds himself the unexpected victim of a tragic misidentification. The lofty identification issues raised by the appellant, therefore, might have been pertinent in some other trial that might have been but seem oddly out of place in the trial that actually was.

## The Photographic Array

The appellant contends that, at a pretrial suppression hearing on June 8, 2010, Judge W. Newton Jackson, III, erroneously failed to suppress an extrajudicial identification of him by the shooting victim, Travis Green. It is a curious contention in several respects.

In his trial testimony on October 10, 2012, Travis Green unhesitatingly identified the appellant as the man who shot him on December 10, 2011.

> Q. When you say "this guy," who are you talking about?
>
> A. You all say his name is Marcus Smiley. I don't know him personally.
>
> Q. Where is he seated?
>
> A. He's seated over there. (Pointing)
>
> [PROSECUTOR]: Let the record reflect that the witness has identified the Defendant.

There was no objection to this in-trial identification. Indeed, at no time in his pretrial motion or at the hearing did the appellant ever move to have the subsequent in-trial identification suppressed as the "fruit of the poisonous tree" of the allegedly impermissibly suggestive photographic identification. The appellate contention now before us, neither in

its title nor in a single line of its argument, even alludes to the in-trial identification. A causative link-up between an extrajudicial identification and a subsequent judicial identification could, to be sure, be alleged and shown, but it is by no means automatic. This appellant simply has not challenged his in-court identification by Travis Green.

This lack of a challenge would make harmless error (were it necessary to fall back on Plan B; it is not) virtually a foregone conclusion. The reference to the extrajudicial photographic identification was very brief and low-keyed. Its significance was pale beside that of an in-court identification. The statement of Elmer Duffy, moreover (which we have held to have been admissible), clinched the identification of the appellant. Elmer Duffy had known the appellant and his family for years and they conversed with each other, by name, immediately prior to the shooting. If that were not enough, the appellant himself in his sworn testimony placed himself at the scene of the shooting and corroborated 90% of the narratives of both Elmer Duffy and Travis Green. Were the issue of harmless error before us, we would have no glimmer of a doubt that Green's extrajudicial identification did not influence the jury's verdict in any way.

## It Is Not Ours To Second-Guess

The contention is curious in a second respect – at least as it is urged upon us. In arguing that a photographic array was impermissibly suggestive, the appellant presents us with a copy of the photographic array, virtually as a res ipsa loquitur exhibit. It is a legitimate tactic – but one with sensitive undertones. When holding before one's eyes the

exhibit that is the centerpiece of the entire hearing, there is the instinctive temptation to make an independent judgment as to whether the array is or is not suggestive, ignoring the fact that it was another judge's job to make that judgment. There is a thin line between having one's own opinion and second-guessing, and it calls for Spartan appellate self-discipline to avoid the latter.

## Suppression Has Become Virtually An Anachronism

Suggestiveness, however, is but a part of a significantly larger equation. Suppression, moreover, is no longer the remedy of choice. The constitutional heyday of identification law lasted for precisely a decade and, early on, suppression was a large part of it. In <u>Turner v. State</u>, 184 Md. App. 175, 178, 964 A.2d 695 (2009), this Court briefly summarized that constitutional season in the sun.

> Beginning with the promulgation of the <u>Wade-Gilbert-Stovall</u> trilogy on June 12, 1967, <u>the constitutionality of extrajudicial identifications shot into prominence and then dominated the center stage until its run ended ten years and four days</u> later with the promulgation of <u>Manson v. Brathwaite</u>, 432 U.S. 98, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977). <u>Early in the run</u>, following the lead of <u>United States v. Wade</u>, 388 U.S. 218, 87 S. Ct. 1926, 18 L. Ed. 2d 1149 (1967), and <u>Gilbert v. California</u>, 388 U.S. 263, 87 S. Ct. 1951, 18 L. Ed. 2d 1178 (1967), and relying on an accused's Sixth Amendment right to counsel at any critical stage, <u>the exclusion of identification evidence as a matter of constitutional law was in high vogue.</u>

(Emphasis supplied).

We pointed out how the exclusionary trend ebbed significantly as attention soon turned from the Sixth Amendment right to counsel to Fourteenth Amendment due process.

- 32 -

Whatever vitality the Wade-Gilbert-Stovall trilogy still retained after 1973 was by virtue of its third member, Stovall v. Denno, 388 U.S. 293, 87 S. Ct. 1967, 18 L. Ed. 2d 1199 (1967). Unlike Wade and Gilbert, Stovall was grounded in the due process clause of the Fourteenth Amendment rather than in the right to counsel of the Sixth Amendment. In one sense, a due process claim under Stovall enjoyed much broader coverage than a right to counsel claim under Wade and Gilbert because a due process claim is not limited to post-indictment procedures and does not require that the procedure be considered a critical stage. On the other hand, whereas a Sixth Amendment violation results in virtually automatic exclusion of the identification, a due process violation only occasionally does so. Instead of exclusion, an arguable due process violation generally calls for a balancing of competing factors under a "totality of circumstances" approach, and this is, far more often than not, a weighing function for a jury rather than an exclusionary function for a judge.

184 Md. App. at 179 (emphasis supplied).

By the end of the 1967-1977 decade, the focus was almost exclusively on Fourteenth Amendment reliability under the three-pronged reliability test of Simmons v. United States, 390 U.S. 377, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968). We described that final development in Conyers v. State, 115 Md. App. 114, 117-18, 691 A.2d 802 (1997):

The due process criterion was more fully fleshed out in Simmons v. United States (1968) and reached full flower in Neil v. Biggers (1972), and Manson v. Brathwaite (1977). The final definition for an excludable pretrial identification became "one that was so [1] impermissibly [2] suggestive [3] as to give rise to a very substantial likelihood of irreparable misidentification." The third requirement massively curtailed the applicability of the first two and effectively returned identification law to where it had been before the Wade-Gilbert-Stovall trilogy enjoyed its brief moment in the sun.

With Manson v. Brathwaite in 1977, the constitutional phase of identification law had largely run its course. The Supreme Court pointed out that

- 33 -

> inflexible rules of exclusion, that may frustrate rather than promote justice, have not been viewed recently by this Court with unlimited enthusiasm.

432 U.S. at 113, 97 S. Ct. at 2252. Except in extreme cases, the Supreme Court was content to let the trustworthiness of an identification be left to a commonsense weighing process by lay jurors[.]

(Emphasis supplied).

The Supreme Court in Perry v. New Hampshire, 565 U.S. ___, 132 S. Ct. 716, 181 L. Ed. 2d 694 (2012), virtually pronounced an obituary over the use of exclusion in challenged identification cases.

> When a witness identifies the defendant in a police-organized photo lineup, the Court ruled, the identification should be suppressed only where "the photographic identification procedure was so [unnecessarily] suggestive as to give rise to a very substantial likelihood of irreparable misidentification." ....

> Synthesizing previous decisions, we set forth in Neil v. Biggers, and reiterated in Manson v. Brathwaite, the approach appropriately used to determine whether the Due Process Clause requires suppression of an eyewitness identification tainted by police arrangement. The Court emphasized, first, that due process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary. Even when the police use such a procedure, the Court next said, suppression of the resulting identification is not the inevitable consequence.

> A rule requiring automatic exclusion, the Court reasoned, would "g[o] too far," for it would "kee[p] evidence from the jury that is reliable and relevant," and "may result, on occasion, in the guilty going free." Brathwaite (when an "identification is reliable despite an unnecessarily suggestive [police] identification procedure," automatic exclusion "is a Draconian sanction," one "that may frustrate rather than promote justice").

132 S. Ct. at 724 (emphasis supplied).

**A Three-Pronged Test For Identification Excludability**

Simmons v. United States sets out a three-pronged definition for an excludable extrajudicial identification. In the due process challenge to the police use of a photographic array in that case, the Supreme Court held that an identification should be suppressed only where

> the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.

390 U.S. at 384. See Perry v. New Hampshire, 132 S. Ct. at 724.

The first requirement is that the photographic array or other extrajudicial identification procedure be suggestive. It is further required that even if the procedure were suggestive, it must be impermissibly (or unnecessarily) suggestive. Stovall v. Denno, 388 U.S. 293, 87 S. Ct. 1967, 18 L. Ed. 2d 1199 (1967). The third requirement, at least where the defendant seeks to exclude a subsequent in-court identification as the "fruit of the poisonous tree," is that even an impermissibly suggestive identification procedure must have been so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. Not a mere "likelihood" but a "very substantial likelihood"! Not a mere "misidentification" but an "irreparable misidentification"! That's a hard furrow to plow. These are three integral parts of a single definition. It is not the case that a defendant need establish only the first and second elements and then sit back and enjoy a presumption as to the third element, which the State must then try to rebut. The proponent of exclusion carries the burden of justifying exclusion.

## Suggestiveness May Be In The Eye Of The Beholder

With three hurdles to surmount, the appellant never got over the first hurdle. Corporal Durbin Hamilton of the Wicomico County Sheriff's Office put together the photographic array. When asked how she compiled it, she explained:

> We have a computer system at our office, it's consisted of about 10,000 photos that we've obtained through Salisbury City Police Department, Fruitland Police Department, the jail, photos that we've taken ourselves, and then we have a program that puts it into a photo lineup. And we then basically cut and paste the pictures into that photo lineup.

Selecting five pictures from her computer system, she cut and pasted those five along with a picture of the appellant on to a single sheet of paper. Those six photographs constituted the array. The original was in color. She also made a black and white copy.

It was Special Agent Matt Beccio of the Federal Bureau of Alcohol, Tobacco, Firearms and Explosives who showed the black and white copy of the array to Travis Green at the Maryland Shock Trauma facility in Baltimore on December 12, 2011, two days after the shooting. The photographic array had been sent to him electronically from the Wicomico Bureau of Investigation. He used the black and white copy instead of the color copy because, "I only had access to a black and white printer that day so I printed it out black and white."

Of the six photographs in the array, the appellant's was in the Number 5 position. On the first four photographs in the array, the heads of the subjects appear somewhat narrowed or elongated as if there had been some sort of glitch in transmission, either from

- 36 -

the computer file to Corporal Hamilton in the first instance or from Wicomico County to

Baltimore in the second instance. Judge Jackson commented in this regard:

> But for the sake of argument I will agree that one, two, three and four seem to be slightly elongated, maybe that's a result of transmission through telephone wires or computer or cyberspace, I don't know what causes it.

Agent Beccio described his technique in asking Travis Green to make an

identification.

> THE WITNESS: I unsealed the envelope. I took the photo lineup out of the envelope, laid it face down on his side, the side that he was not injured that he could use his left arm, laid it face down and asked him to turn it over when he was ready.

> BY MS. DISHAROON:

> Q. And did he turn it over?

> A. He did.

> Q. Did he pick anybody out of the photo array?

> A. Once he turned it over I handed him a pen in his right hand, which is the hand I mentioned before had the cast on it that was injured in the shooting incident, and within I would say maybe 30 or so seconds, approximately 30 or so seconds he pointed to what was the picture number five in this array and said this is the guy and began to try to circle it with the pen that he had had in his hand, his right hand.

> Q. Did he attempt to sign it as well?

> A. Yes, he attempted to actually initial on the right side there but because of his injuries he could not really write properly.

> Q. But he pointed out photo number five.

> A. He did.

- 37 -

....

Q.  Did you ever tell Travis Green who to pick from the photo array?

A.  Absolutely not.

Q.  Did you promise him anything to get him to pick any particular individual?

A.  Absolutely not.

Q.  Did you make any threats to him or implied threats to him to get him to pick any particular individual?

A.  Absolutely not.

The conduct of the identification procedure appears to have been impeccable.

The apparent electronic glitch in the reproducing of four of the photographs is the appellant's entire basis for urging exclusion.  All six photographs are of faces that are recognizable.  The culprit to be selected from the array could as readily have been one of the four whose heads appear elongated as one of the two whose heads do not so appear.

An argument, to be sure, could be made in favor of suggestiveness, but a counterargument could just as surely be made, as Judge Jackson did:

But this can be said about all of the photographs.  <u>They depict six African-American males, all roughly of the same age, all with close-cropped hair, no corn rows, no dreadlocks, no Afros, all close-cropped hair.  Five of the six have receding hairlines.  All six have facial hair of the same style.</u>  And I don't know what the style is called, it's very prevalent nowadays, practically every baseball player you see on television has the same thing.  I'm sure there's a word for it.  <u>Not full beards, not goatees, not single soul patches, but the same type of facial hair.  They all have the same expression on their faces, too, people who aren't happy having their picture taken, they look rather glum.</u>  Nobody is smiling.  In other words <u>picture number five, who apparently is the</u>

- 38 -

individual identified, does not wear a different facial expression than the other five photographs.

Judge Jackson concluded that the photographic array, albeit not perfect, was not fatally suggestive.

> I'm satisfied based upon what I heard from both of those witnesses as well as the two ATF officers that there was no deception involved, no coercion, no promises made to either of the two people to pick out photograph number five. More could have been said, but I don't know if that would have made a bit of difference. As both counsel know, the test is whether – it's a two stage test. First the Defendant must demonstrate that the identification is impermissibly suggestive, and second, if the Defendant does that then the State has the burden of proving by clear and convincing evidence existence of reliability which outweighs suggestiveness.
>
> Dr. Brigham concluded that this was essentially a two person or a two photograph array. I'm not necessarily agreeing with him in that respect. I think it's a perfectly – it's not a perfect photographic array, but it's an adequate photographic array for purposes of making an identification without impermissibly suggesting to the viewer which picture to pick out.
>
> But I would also refer you, [Defense Counsel], to [In re Matthew S., 199 Md. App. 436, 23 A.3d 250 (2011),] where the Court of Special Appeals upheld identification by a single photograph, that was a yearbook photograph. So it doesn't have to be contained with the other photographs. Yes, it's better that there are other photographs, it might have been better had there been 24 pictures instead of six. But even if you call it a two photograph array, it still is not impermissibly suggestive. So that's going to be the finding of the Court with respect to State's Exhibits 2 and 3.

(Emphasis supplied).

Even if impermissibility is inextricably intertwined with suggestiveness, there is no need even to go on to the third factor of the ultimate reliability of the identification. On the issue of impermissible suggestiveness, plausible arguments were made in both directions.

On appellate review, our posture is deferential. We look at the evidence in the light most favorable to the prevailing party (in this case, the State). Employing that deference, we cannot say that Judge Jackson's findings were clearly erroneous or that his ruling was an abuse of discretion.

### Expert Opinion On Eyewitness Memory and Identification

The final contention will not detain us long. The defense sought to call a Dr. Brigham as an expert witness who would have given the jury an overview of present scientific knowledge concerning eyewitness memory; about how facial memories are acquired and encoded, retained, and then retrieved; and about such high stress factors as weapon focus and unconscious transference. He was ready to opine about how Agent Beccio's identification procedure with Travis Green would have been more reliable if the "double blind" process had been used, in which the officer administering the identification procedure does not know which photograph is that of the suspect.

Judge Simpson ruled that Dr. Brigham's opinions would not have been helpful to the jury:

> Several issues were identified, that the victim ran from the assailant as he was shot, which was an event of high stress, and during which he would have or may have had weapon focus, that he saw the assailant for a brief duration and there could have been unconscious transference, the nature of the lineup and the photographs, and that it would have been preferable to use a double blind lineup. So those were really the three issues.
>
> Under the standard in Bomas[ v. State, 412 Md. 392, 987 A.2d 98 (2010)], these issues are issues that are intuitive. All of these issues can be brought out

under cross-examination of the witnesses, the fact witnesses and are subject to the argument to the jury.

The Court finds that the expert testimony will not be of real appreciable help to the trier of fact. Accordingly, the Court finds that the testimony of Dr. Brigham is inadmissible.

We agree.

**JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.**