Marcus Lee Smiley v. State of Maryland, No. 37, Sept. Term 2014, Opinion by Battaglia, J.

**CRIMINAL PROCEDURE – EYEWITNESS IDENTIFICATION – IMPERMISSIBLY SUGGESTIVE PROCEDURE**

An extrajudicial identification is not impermissibly suggestive when the photographs of four of the six individuals in the photographic array were slightly elongated in the face and torso.

**CRIMINAL PROCEDURE – EYEWITNESS IDENTIFICATION**

The Court declined to adopt the approach promulgated by the New Jersey Supreme Court in *State v. Henderson*, 27 A.3d 872 (N.J. 2011), for assessing the admissibility of an extrajudicial eyewitness identification, because *Jones v. State*, 310 Md. 569, 530 A.2d 743 (1987), delineates the standard in Maryland to be applied in evaluating eyewitness identification.

**EVIDENCE – HEARSAY EXCEPTIONS – FORFEITURE BY WRONGDOING – EVIDENCE OF PARTY'S INVOLVEMENT**

The trial court did not err in finding, by clear and convincing evidence, that the defendant had "engaged in, directed, or conspired to" procure the witness's absence, pursuant to Section 10-901 of the Courts and Judicial Proceedings Article of the Maryland Code and Maryland Rule 5-804(b)(5)(B).

Circuit Court for Wicomico County,
Maryland
Case No. K12-0028
Argued: January 12, 2015

IN THE COURT OF APPEALS
OF MARYLAND

No. 37
September Term, 2014

MARCUS LEE SMILEY

v.

STATE OF MARYLAND

Barbera, C.J.
Harrell
Battaglia
Greene
Adkins
McDonald
Watts,

JJ.

Opinion by Battaglia, J.

Filed: March 9, 2015

During the early hours of December 10, 2011, while smoking a cigarette in his girlfriend's backyard, in Salisbury, Maryland, Travis Green noticed Marcus Smiley, Petitioner, between five and seven feet away, "looking crazy and everything", sitting atop the steps of the adjacent house. Within moments, when Green was about to leave, Smiley asked him, "did [you] see where he went?", to which Green did not reply. When Green was about to enter his truck, Smiley fired the first shot at him, at close range.

After Green attempted to escape by sliding across the front seat of the truck and fleeing, Smiley gave chase while shooting at Green, striking him in his right arm, abdomen and thigh. Though out of ammunition, "[Smiley] kept clicking the gun, you know, it wasn't no more bullets left in it", according to Green, who asked, "what are you still trying to shoot me for, what is this about, money?" Smiley, though, did not answer and "just took off after" the incident.

Green was flown to Shock Trauma for treatment, where two days later Special Agent Matthew Beccio of the Federal Bureau of Alcohol, Tobacco, Firearms and Explosives presented him with a photographic array created by the Wicomico County Bureau of Investigation. The photo array contained six photographs, including that of Smiley, created from digital images cached in an electronic database of those who "had the same physical appearance, facial appearance as [Smiley]". The six photographs had been arranged in two rows of three, with Smiley's photograph located in position five. Green selected Smiley's photograph in "approximately 30 or so seconds".

At the subsequent hearing, in the Wicomico County Circuit Court, during which the array was scrutinized by Judge Newton Jackson, III, Judge Jackson noted that four of the

photographs in the array were "slightly elongated with respect to the head, neck and what little bit of the torso of each individual can be seen", but still resembled people "who have that kind of build." Judge Jackson also described the similarities among the subjects of the photographs:

> They depict six African-American males, all roughly of the same age, all with close-cropped hair, no corn rows, no dreadlocks, no Afros, all close-cropped hair. Five of the six have receding hairlines. All six have facial hair of the same style. . . . They all have the same expression on their faces, too, people who aren't happy having their picture taken, they look rather glum. Nobody is smiling. In other words, picture number five, who apparently is the individual identified, does not wear a different facial expression than the other five photographs.

Elmer Duffy, who had been an employee of a painting contractor in Salisbury, Maryland, observed the shooting and related a story consistent with that of Green's to investigators for the Wicomico Bureau of Investigation. In an interview recorded three days after the shooting, Mr. Duffy explained that, on the morning of December 10, he was to paint the house next door to Green's girlfriend's, when, as he walked up, he immediately recognized Smiley, with whom he had played basketball "way back in the '80s".[1] While

---

[1] Mr. Duffy instantaneously identified Smiley:
> [DETECTIVE]: All right. Let me – when you first walked up – let me clarify this. When you first walked up to the house that you were doing work on and you saw – and you saw Mark [Smiley], did you make any kind of contact with him at all?
> [MR. DUFFY]: Yeah. Made eye contact with him. I spoke to him. I said, "What's up, Mark?" . . . And he said, "Hey, what's up, Elmer?"
>                              * * *
> [DETECTIVE]: So there was no question whatsoever in your mind at that point you – that's –
> [MR. DUFFY]: On my mother's grave that was Mark Smiley.

inside the house, Mr. Duffy raised the blinds to "see what [Smiley] be doing". Mr. Duffy told the investigators the same story as that given by Green: Smiley charged at Green as Green approached his truck; Smiley shot at and chased Green; and Smiley fled after the incident.

The morning after Mr. Duffy's interview, Smiley made two telephone calls from the Wicomico County Detention Center, which were recorded by the Detention Center as part of its regular practice. In the two calls, one of which was to his mother and the other to an unidentified female, Smiley stated that he knew Mr. Duffy would testify against him, which he wanted to prevent; in the first conversation with his mother, Smiley asked that his nephew, Keith "Heathcliff" Parker,[2] get Mr. Duffy "out of the picture":

> [SMILEY]: That's crazy, [M]om. But let – let Heathcliff – Heathcliff and Kev and them know that the boy who lives across the street from Kevin,[3] Elmer Duffy, was a witness. He – he told people he seen me standing outside and he seen me running with the gun and all that stuff.
> * * *
> Elmer – Elmer Duffy, the boy that lives across the street from Kevin, [M]om. The boy that lives across the street from Kev.
> * * *
> You see that boy Elmer, get him out of the picture. You know, I don't want that stuff. I ain't trying to go out like that, [M]om.
> * * *
> [SMILEY]: And Kevin, I'll take him – I'll see him Sunday, man.
> [SMILEY'S MOTHER]: All right.
> [SMILEY]: Make sure he take care of everything, [M]om, what I'm talking about. You know what I'm talking about –
> [SMILEY'S MOTHER]: All right.

---

[2] At a subsequent hearing before Judge Leah J. Seaton, Smiley's fellow inmate, who testified, reaffirmed what he had previously told investigators, that "Heathcliff" was Smiley's nephew, Keith Parker.

[3] "Kevin" has not been further identified.

3

In the second telephone call, Smiley tells the unidentified female to tell "Heathcliff" to "make sure that [Mr. Duffy] don't . . . come to court":

> [SMILEY]: . . . I think Heathcliff's number is 359-1366. Take that number down, too. (443)359-1366.
> MS. SPEAKER: Okay.
> [SMILEY]: Okay. And tell him that I said, man, make sure that [Mr. Duffy] don't – he don't come to court, man.
> MS. SPEAKER: Okay.
> [SMILEY]: And make sure they don't – do you know what I mean?
> MS. SPEAKER: Yeah.

Two months after Smiley's telephone calls, Mr. Duffy was murdered, for which Keith "Heathcliff" Parker was indicted.

With respect to the incident with Green, Smiley was charged in a seventeen count indictment with attempted first degree murder, attempted second degree murder, four counts of first degree assault, four counts of second degree assault, four counts of reckless endangerment, wearing, carrying or transporting a handgun, use of a firearm in the commission of a felony and possession of a firearm after having been previously convicted of a felony. A motions hearing was held later before Judge Jackson to address, *inter alia*, Smiley's motion to suppress Green's identification.

Smiley argued that the identification was blighted by an impermissibly suggestive photo array as a result of the elongated appearance of the other men in the four photographs. Smiley presented Dr. John C. Brigham, who had testified as an expert in the field of eyewitness identification, who opined that, "people presumably would be unlikely" to pick a distorted image. Judge Jackson, however, did not find the array to be impermissibly suggestive in stating, "it's not a perfect photographic array, but it's an adequate

4

photographic array for purposes of making an identification without impermissibly suggesting to the viewer which picture to pick out."

After Mr. Duffy's murder, the State noted its intent to introduce at trial Mr. Duffy's recorded statement to investigators, under Section 10-901 of the Courts and Judicial Proceedings Article of the Maryland Code (1974, 2006 Repl. Vol., 2012 Supp.)[4] and

---

[4] Section 10-901 of the Courts and Judicial Proceedings Article of the Maryland Code provides:

> (a) *In general.* — During the trial of a criminal case in which the defendant is charged with a felonious violation of Title 5 of the Criminal Law Article or with the commission of a crime of violence as defined in § 14-101 of the Criminal Law Article, a statement as defined in Maryland Rule 5-801(a) is not excluded by the hearsay rule if the statement is offered against a party that has engaged in, directed, or conspired to commit wrongdoing that was intended to and did procure the unavailability of the declarant of the statement, as defined in Maryland Rule 5-804.
> (b) *Hearing.* — Subject to subsection (c) of this section, before admitting a statement under this section, the court shall hold a hearing outside the presence of the jury at which:
> (1) The Maryland Rules of Evidence are strictly applied; and
> (2) The court finds by clear and convincing evidence that the party against whom the statement is offered engaged in, directed, or conspired to commit the wrongdoing that procured the unavailability of the declarant.
> (c) *Exceptions* — A statement may not be admitted under this section unless:
> (1) The statement was:
> > (i) Given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding or in a deposition;
> > (ii) Reduced to writing and signed by the declarant; or
> > (iii) Recorded in substantially verbatim fashion by stenographic or electronic means contemporaneously with the making of the statement; and
> (2) As soon as is practicable after the proponent of the statement learns that the declarant will be unavailable, the proponent notifies the adverse party of:
> > (i) The intention to offer the statement;
> > (ii) The particulars of the statement; and

(continued . . . )

Maryland Rule 5-804(b) (2012),[5] as a result of Smiley's alleged procurement of Mr. Duffy's death. The State's notice included a statement that Parker had been charged for Mr. Duffy's murder. The defense objected, although acknowledged that Parker had been charged for the murder.

At the pretrial hearing before Judge Leah J. Seaton of the Circuit Court for Wicomico County, an inmate testified that, upon hearing of Mr. Duffy's death, Smiley was relieved that Mr. Duffy would not testify at trial and was "jumping up and down" in excitement:

> [STATE'S ATTORNEY]: Tell Judge Seaton what the defendant said.
> [INMATE]: It was just like, it was in regards to the fact that [Mr. Duffy] was, I guess he was an eyewitness or something to whatever he had done or whatever, and I guess he was just more or less relieved that person was . . . the fact that that person wouldn't be there to testify against him.

---

(continued . . . )
        (iii) The identity of the witness through whom the statement will be offered.
Md. Code Ann., Cts. & Jud. Proc. § 10-901 (1974, 2006 Repl. Vol., 2012 Supp.). All references to Section 10-901 of the Courts and Judicial Proceedings Article of the Maryland Code are to the 2012 version of the statute.

[5] Maryland Rule 5-804(b) provides, in relevant part:
     (b) **Hearsay Exceptions.** The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
               * * *
     (5) Witness unavailable because of party's wrongdoing.
               * * *
        (B) Criminal causes. In criminal causes in which a witness is unavailable because of a party's wrongdoing, admission of the witness's statement under this exception is governed by Code, Courts Article, § 10-901.
All further references to Maryland Rule 5-804 will reflect the 2012 language of the Rule.

[STATE'S ATTORNEY]: Okay. What, if any, actions on the defendant's part did you observe?
[INMATE]: At first, he was like he, it was like, it was like totally, I guess it was like disbelief, and then it was like excitement, and I guess he went through a lot of different emotions.
[STATE'S ATTORNEY]: How did he express excitement?
[INMATE]: One time, it was like he was, I guess he was just excited, I guess, like happy.
[STATE'S ATTORNEY]: What was he doing to show that?
[INMATE]: I guess he was like, he was jumping up and down like he was happy or something.

During the hearing before Judge Seaton, the inmate also testified that Smiley had told him that Parker was involved with Mr. Duffy's murder:

[SMILEY'S COUNSEL]: Do you remember that [the investigating officer] told you that the police thought that Keith Parker murdered Mr. Duffy and that Mr. Keith Parker's nickname was Heathcliff?
[INMATE]: Yeah, after we got talking more about the whole situation after
[SMILEY'S COUNSEL]: Well, he told you. You didn't tell him?
[INMATE]: No, I told him – I told him because, because when we were back in there – when we were back in the cell, he was saying something about his nephew, Heathcliff. I wanted to know who Heathcliff was and not unless if he told me –

Judge Seaton, during the hearing, also took judicial notice of the case file for the murder charge filed against Parker, case number K12-0587, in the Circuit Court for Wicomico County, Maryland, which included Parker's indictment for the first degree murder of Mr. Duffy. Judge Seaton found that Smiley had specifically requested that Parker prevent Mr. Duffy from appearing at trial, that the inmate's testimony regarding Smiley's statement and reaction was credible and that Parker took part in Mr. Duffy's murder. Judge Seaton then found, by clear and convincing evidence, that Smiley "engaged in, directed or conspired to commit the wrongdoing that procured the unavailability of Mr.

7

Duffy" and, therefore, concluded that Mr. Duffy's statement about seeing Smiley shoot Green was admissible at trial:

> [THE COURT]: The State's Notice of Intent to submit the recorded statement of Elmer Duffy was opposed by the defendant. Section 10-901 of Courts and Judicial Proceedings governs the admissibility of the recorded statement. The Court has considered the State's notice, the defendant's opposition and supplemental filing and oral arguments, admitted exhibits, the testimony of [the inmate], and the recorded statement and transcript of that conversation which actually reflected the conversation.
>
> Under [Section] 10-901, the Court finds by clear and convincing evidence that the defendant engaged in, directed or conspired to commit the wrongdoing that procured the unavailability of Mr. Duffy. Mr. Duffy was murdered. Keith Parker has been charged with that murder.
>
> The Court finds that [the inmate's] testimony about the defendant's statements and his reaction to the news of Mr. Duffy's murder to be credible.
>
> In addition, the Court notes that in the conversation with his mother, the defendant wanted to, quote "get Mr. Duffy out of the picture," end quote. He also tells – well, the quote part is "out of the picture". He also tells his mother at the end of the conversation quote, "make sure they take care of everything, Mom. I'm talking about, you know what I'm talking about." period end quote.
>
> The Court takes judicial notice of the case file in this court, Case Number K12-0587 in which the murder charges are pending against Mr. Parker. It is not persuaded by counsel's argument that the State has not proven the wrongdoing, nor that the State has failed by clear and convincing evidence to establish that the defendant engaged in, directed or conspired to commit the wrongdoing that procured the unavailability of Mr. Duffy.

During Smiley's trial, Green testified and identified Smiley as the individual who had assaulted him; Mr. Duffy's recorded statement, as well as its transcript, also were admitted. Smiley was convicted of attempted first degree murder, use of a firearm in the commission of a crime of violence, three counts of reckless endangerment and the possession of a regulated firearm after having been previously convicted of a crime of violence; he was sentenced to life imprisonment plus ten years.

8

In a reported opinion, the Court of Special Appeals affirmed the admission of both Green's extrajudicial identification and Mr. Duffy's statement. *Smiley v. State*, 216 Md. App. 1, 28, 37, 84 A.3d 190, 205, 211 (2014). Our intermediate appellate court concluded that it was not clear error for Judge Jackson to find that the photo array was not impermissibly suggestive and that he was within his discretion to admit the identification into evidence at trial. *Id.* at 37, 84 A.3d at 211. The court also held that it was not clear error for Judge Seaton to find that Smiley was involved in procuring Mr. Duffy's unavailability, based upon the facts she found connecting Smiley to the murder:

> 1) that [Smiley] ardently and insistently sent word to his nephew to get rid of Elmer Duffy, 2) that Elmer Duffy was subsequently murdered, 3) that [Smiley] jubilantly reacted to the news of the murder, and 4) that nephew Heathcliff Parker was, indeed, then charged with that murder.

*Id.* at 24, 84 A.3d at 203.[6]

We granted Smiley's Petition for Certiorari to consider the following questions, which we have renumbered:

---

[6] Smiley's questions before the Court of Special Appeals were:
1.   Did the lower court err in admitting the recorded pre-trial statement of an unavailable witness where the only evidence connecting Mr. Smiley to the witness's unavailability was a proffer that Mr. Smiley's nephew was charged with murdering that witness?
2.   Did the lower court err in failing to suppress a pre-trial extrajudicial identification of Mr. Smiley where his photograph was one of only two in a photographic array which was not digitally altered, and his appearance differed from the other non-altered photograph in the array and matched the description of the shooter?
3.   Did the lower court err in determining that Mr. Smiley's proffered expert on the reliability of eyewitness testimony would not help the jury in a case where the primary evidence of criminal agency were two eyewitness identifications?

9

1. Did the lower court err in failing to suppress an extrajudicial identification of Mr. Smiley where his photograph was one of only two in a photographic array which was not visibly altered and his clothing matched the shooter's described attire?
2. Should Maryland adopt, either as a matter of State constitutional or evidentiary law, a standard for evaluating the admissibility of eyewitness identifications which better reflects present scientific knowledge concerning eyewitness memory?
3. Did the trial court err in admitting the statement of an unavailable witness after finding that Mr. Smiley procured the witness's unavailability at trial based on a proffer that Mr. Smiley's nephew was charged with murdering that witness?

*Smiley v. State*, 437 Md. 637, 89 A.3d 1104 (2014).

We shall affirm and shall hold that the elongation of the face and torso of four of the photographs in the photo array did not render the array impermissibly suggestive. We shall also decline to adopt the theories and methodologies promulgated by the New Jersey Supreme Court in *State v. Henderson*, 27 A.3d 872 (N.J. 2011), to review whether extrajudicial identifications are suggestive, because we are satisfied with the two-part test set out in *(Gregory) Jones v. State*, 310 Md. 569, 577, 530 A.2d 743, 747 (1987), *cert. granted, judgment vacated on other grounds*, 486 U.S. 1050, 108 S. Ct. 2815, 100 L. Ed. 2d 916 (1988), *conviction aff'd, sentence vacated and remanded*, 314 Md. 111, 549 A.2d 17, for determining the admissibility of an extrajudicial eyewitness identification. We, finally, shall hold pursuant to Section 10-901 of the Courts and Judicial Proceedings Article of the Maryland Code, and Maryland Rule 5-804(b)(5)(B), that the trial court did not abuse its discretion in admitting the statement of Mr. Duffy.

Smiley, with respect to the first question before us, argues, as he did before the trial court and the Court of Special Appeals, that the photo array was impermissibly suggestive,

because of the elongation of the head and torso in four of the photographs, none of which was his. The State asserts, with respect to the first question, as it did before the trial court and the Court of Special Appeals, that the elongation did not create an impermissibly suggestive photo array.

The admissibility of an extrajudicial identification is determined in a two-step inquiry. *(Gregory) Jones*, 310 Md. at 577, 530 A.2d at 747. "The first question is whether the identification procedure was impermissibly suggestive." *Id.* If the procedure is not impermissibly suggestive, then the inquiry ends. If, however, the procedure is determined to be impermissibly suggestive, then the second step is triggered, and the court must determine "whether, under the totality of circumstances, the identification was reliable." *Id.* If a *prima facie* showing is made that the identification was impermissibly suggestive, then the burden shifts to the State to show, under a totality of the circumstances, that it was reliable. *(Kevin) Jones v. State*, 395 Md. 97, 111, 909 A.2d 650, 658 (2006).

Suggestiveness can arise during the presentation of a photo array when the manner itself of presenting the array to the witness or the makeup of the array indicates which photograph the witness should identify. *See (Gregory) Jones*, 310 Md. at 577, 530 A.2d at 747; *see also Conyers v. State*, 115 Md. App. 114, 121, 691 A.2d 802, 806 (1997), *cert. denied*, 346 Md. 371, 697 A.2d 111 ("The sin is to contaminate the test by slipping the answer to the testee.") (emphasis omitted).

In a case in which we concluded that a photo array was not impermissibly suggestive, we explained that a photo array "'to be fair need not be composed of clones.'" *Bailey v. State*, 303 Md. 650, 663, 496 A.2d 665, 671 (1985), quoting *Webster v. State*, 299

Md. 581, 620, 474 A.2d 1305, 1325 (1984). In that case, Bailey alleged that the photo array shown to the victim was impermissibly suggestive, because the men in four of the six photographs did not resemble him. We concluded that the array was not impermissibly suggestive, because the mug shots that comprised the array reflected a number of similarities, to include: each man was photographed from the same camera angle; each man had the same photo card around his neck, the text of which had been blacked out; each individual was a young black male; each individual had close-cropped hair; several of the men had slight mustaches, though none was bearded; the men wore different styles of casual shirts; and none of the individuals had any unusual features.

In a subsequent case, *Evans v. State*, 304 Md. 487, 499 A.2d 1261 (1985), we held that the identification procedure was impermissibly suggestive when only a single photograph was presented to the witness, under circumstances that were not exigent. In *Evans*, the prosecutor, during a grand jury proceeding, presented a single photograph of the suspect, Evans, to the witness:

> "Q. PROSECUTING ATTORNEY: As you were playing games with [the accomplice] in the bar, a fellow by the name of Shorty comes in, calls [the accomplice], and [the accomplice] and Shorty go outside, is that right?
> "A. [WITNESS]: Right.
> "Q. PROSECUTING ATTORNEY: Now, I show you a Baltimore County Police photograph No. 126237. It is a mug shot, and next to that number are the numbers 6/08/83, indicating the date. Is this the Shorty that you saw?
> "A. [WITNESS]: That is him.
> "Q. PROSECUTING ATTORNEY: For the record, that is a photograph of Vernon Evans, Junior."

*Id.* at 497-98, 499 A.2d at 1266. The single photograph procedure, we stated, was impermissibly suggestive "under the circumstances shown by [that] record", because

12

"[t]here were no exigent circumstances justifying the presentation of a single photograph rather than an appropriate array." *Id.* at 498, 499 A.2d at 1267.

In the instant matter, Agent Beccio presented Green with an array containing six photographs, which, as Judge Jackson found, portrayed six African-American males of roughly the same age with the same hairstyle, the same facial hair and with the same facial expression. With respect to elongation, Judge Jackson also found that, while the pictures were not perfectly identical and that four of the faces "appear[ed] to be slightly elongated", they were not "cartoonish" and, even with the elongation, two of those four photographs depicted individuals "who have that kind of build." None of the four elongated photographs included that of Smiley, who was depicted in one of the two remaining photographs.

Faced with a similar, albeit converse, situation of elongation of a photograph, the Virginia intermediate appellate court reasoned, in *Smith v. Commonwealth*, 733 S.E.2d 683, 688 (Va. Ct. App. 2012), that the elongation of only the suspect's photograph, but not those of the other individuals in the array, was not impermissibly suggestive. The court opined that an elongated face did not, intrinsically, "*suggest* to the victim that the long-faced person was one of the assailants" and, moreover, there was no implication at any point in the investigation that a long-faced man was the assailant. *Id.* at 688.

Here, the elongation of the four photographs, other than that of Smiley's photograph, did not suggest to Green that Smiley was the perpetrator. The dissimilarity related to the elongation of the four photographs and those depicting Smiley and another man did not render the photo array impermissibly suggestive.

13

As to the second question, Smiley urges, as he did in the lower courts, that Judge Jackson, in addressing whether the array was suggestive, should have adopted the theories and methodologies suggested by the New Jersey Supreme Court in *State v. Henderson*, 27 A.3d 872 (N.J. 2011).[7]  The State demurs, asserting that "Maryland trial courts already consider" the methodologies suggested by *Henderson*, because "the suppression court screens for suggestiveness – and [whether] the extra-judicial identification process was 'unnecessarily (impermissibly) suggestive'", quoting *Webster*, 299 Md. at 607, 474 A.2d at 1319.  The State further asserts that we should not adopt the *Henderson* theories and methodologies, because "the studies referred to in *Henderson* have limited value" and, before adoption, any evidence supporting them "should be developed at the trial level".

In *Henderson*, a special master was appointed by the New Jersey Supreme Court "to evaluate scientific and other evidence about eyewitness identifications."  27 A.3d at 877.  The special master heard testimony from individuals who were qualified as experts in eyewitness identification and received various studies regarding the same, from which he made recommendations to the New Jersey Supreme Court with respect to factors that a

---

[7] Counsel for Smiley, after oral arguments, by letter, directed our attention to two recent opinions from the Supreme Judicial Court of Massachusetts, *Commonwealth v. Gomes*, 22 N.E.3d 897 (Mass. 2015), and *Commonwealth v. Johnson*, 22 N.E.3d 155 (Mass. 2015), with respect to what has been termed the "transference effect", which has been defined as "mistakenly identifying a person as a crime perpetrator because of a familiarty with that person in another context."  Brian L. Cutler & Margaret Bull Kovera, Evaluating Eyewitness Identification 47-48 (2010).  As this issue was not raised nor considered at the trial court level we decline to address it.  *(Thomas) Jones v. State*, 379 Md. 704, 712, 843 A.2d 778, 783 (2004).

14

trial court should consider when assessing the suggestibility and reliability of an eyewitness identification. *Id.* at 884-85, 895. Based upon the special master's report, the court promulgated protocols to evaluate eyewitness identifications.[8] *Id.* at 896-911.

Smiley urges adoption of the New Jersey standards for evaluating an eyewitness identification, which, he asserts, "reflects present scientific knowledge concerning eyewitness memory". We decline to do so, because this Court, as well as the Court of Special Appeals, have consistently reaffirmed application of the procedure in *(Gregory) Jones* for examining challenges to the admissibility of eyewitness identifications. *See, e.g.,* *(Kevin) Jones*, 395 Md. at 109-10, 909 A.2d at 657-58; *Thomas v. State*, 213 Md. App. 388, 416-17, 74 A.3d 746, 763-64 (2013), *cert. denied*, 437 Md. 640, 89 A.3d 1106 (2014);

---

[8] The New Jersey Supreme Court concluded that photo arrays should be presented in such a way that the individual presenting the array does not know where the suspect is placed within the array. *Henderson*, 27 A.3d at 896. The court also noted that pre-identification instructions should be given that inform the witness that the suspect may or may not be in the array. *Id.* at 897. The court, in addition, opined that the array should be constructed with at least five fillers and composed of individuals who resemble the suspect. *Id.* at 898. The court, furthermore, instructed that the presenter of a photo array should avoid giving feedback to the witness. *Id.* at 899. The court also noted that a witness should not view a suspect before the identification. *Id.* at 900-01. The court, finally, cautioned that showups are inherently suggestive. *Id.* at 902-03.

The court also opined, regarding the reliability of an identification, that a witness's stress at the time of the incident can affect the identification. *Id.* at 904. Reliability, according to the court, may also diminish with the presence of a weapon at the scene. *Id.* at 904-05. The duration of the incident, continued the court, as well as the distance the eyewitness was from the scene and the lighting of the incident may have an impact on the reliability of an identification. *Id.* at 905-06. The court, also, noted that certain characteristics, such as the level of intoxication of the witness, the race of the perpetrator and whether the perpetrator wore a disguise can affect reliability. *Id.* at 906-07. The court, finally, cautioned that memory may fade over time. *Id.* at 907.

15

*Mendes v. State*, 146 Md. App. 23, 35-36, 806 A.2d 370, 377-78 (2002); *McDuffie v. State*, 115 Md. App. 359, 366-67, 693 A.2d 360, 363-64 (1997).

In any event, if expert testimony regarding an eyewitness identification is offered, its admissibility is governed by Maryland Rule 5-702[9] and *Bomas v. State*, 412 Md. 392, 987 A.2d 98 (2010). We stated in *Bomas* that our standard, the development of which predated our adoption of Maryland Rule 5-702 but is substantially similar,[10] is "whether [the expert's] testimony will be of real appreciable help to the trier of fact in deciding the issue presented". *Id.* at 416-17, 987 A.2d at 112 (internal citation and quotation omitted). *Bomas* had urged us, however, to "adopt a standard that favor[ed] the admissibility of expert testimony on eyewitness memory identification in criminal cases", asserting "that jurisdictions have trended toward the admissibility of" such evidence and Maryland should follow in-kind. *Id.* at 403, 416, 987 A.2d at 104, 112. We declined to alter our standard, but opined that "trial courts should recognize these scientific advances in exercising their

---

[9] Maryland Rule 5-702 provides:
> Expert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. In making that determination, the court shall determine (1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education, (2) the appropriateness of the expert testimony on the particular subject, and (3) whether a sufficient factual basis exists to support the expert testimony.

[10] Maryland Rule 5-702, along with the rest of Chapter 5 of the Maryland Rules, was adopted on December 15, 1993, and became effective July 1, 1994. 21:1 *Maryland Register* P-1 (Jan. 7, 1994).

discretion whether to admit such expert testimony in a particular case."[11]  *Id.* at 416, 987 A.2d at 112.

We again shall decline to adopt a new standard regarding the admissibility of an extrajudicial eyewitness identification, or for incorporating expert testimony into challenges of an eyewitness identification, because our jurisprudence already provides suitable means to assay an eyewitness identification.

We, finally, address Smiley's contention that the statements given by Mr. Duffy identifying Smiley as the shooter just two months prior to Mr. Duffy's murder were inadmissible, because the State allegedly did not prove, by clear and convincing evidence, that Smiley procured Mr. Duffy's unavailability, as required by Section 10-901 of the Courts and Judicial Proceedings Article of the Maryland Code and Maryland Rule 5-804(b)(5)(B).  Smiley asserts that "[t]here was no evidence of Mr. Parker's involvement in the killing because a mere arrest has no probative value" and, therefore, there was "no evidence connecting Mr. Smiley to that killing."  We disagree.

In the wake of the proliferation of the "Stop Snitching!" video in and around Baltimore City in 2004, in which "drug dealers" threatened violence to witnesses and

---

[11] In *Bomas*, we also noted that "some of the factors of eyewitness identification are not beyond the ken of jurors" and, therefore, their consideration does not depend upon expert testimony.  *Bomas*, 412 Md. at 416, 987 A.2d at 112.  We noted, for example, that "the effects of stress or time are generally known to exacerbate memory loss".  *Id.*  Insofar as similar factors were promulgated by the New Jersey Supreme Court, our jurisprudence already recognizes that certain elements influence eyewitness identifications and may be taken into account by the trial judge and jury without the admission of expert testimony.

police informants who testified against drug operatives,[12] companion administration bills to address the harm were introduced during the 2005 legislative session in the Maryland Senate and House of Delegates, identified as Senate Bill 188 and House Bill 248. As initially proposed, the bills, *inter alia*, provided for an exception to the hearsay rule that would have permitted the admission of a prior statement given by a victim or witness if, in a criminal case, the person against whom the statement was to be introduced intentionally caused, or solicited another to procure, the unavailability of the victim or witness.[13] The proposal also included a notice provision.[14]

Supporters of the bills emphasized that their passage was necessary to discourage violent intimidation of witnesses, citing various examples:

- In November 2002, Baltimore City police Detective Thomas Newman was assassinated in retaliation for testifying against the half-brother of

---

[12] The "Stop Snitching!" video "warn[s] that the payback for snitches is a bullet in the head." *Witness intimidation*, Balt. Sun, Dec. 9, 2004, at 26A, *available at* http://articles.baltimoresun.com/2004-12-09/news/0412090090_1_witness-intimidation-stop-snitching-drug-trade (last visited Mar. 4, 2015).

[13] The proposed hearsay exception was based upon Federal Rule of Evidence 804 (2005), which provided, in relevant part:

> (b) Hearsay Exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> * * *
>
> (6) *Forfeiture by Wrongdoing*. A statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness.

[14] Other provisions in the bills, which were ultimately redacted by the legislature, included increasing the penalty for procuring a witness's unavailability, additional laws criminalizing the solicitation of another to cause a witness's unavailability and removing juvenile court jurisdiction over those sixteen years old or older who had been accused of wrongdoing related to an unavailable witness.

one of his killers, who was put on trial for wounding Newman in a 2001 shooting.

- Rickey Prince, a 17-year-old Baltimore County homicide witness, was kidnapped and shot in the head by two friends of the murderer in 2003.
- Tjane C. Marshall, the murderer of a pregnant Columbia woman, told witness Rashall Wall that he would be killed if he testified. The victim was found shot four times in the face, lying in bed at her Stevens Forest apartment in Columbia's Oakland Mills village in May 2003.
- In January 2004, four men barged into Anthony Black's home, pointed their guns at his fiancée and 10-year-old son, and threatened to kill them if Black testified about their drug ring.
- On July 14, 2004, Tashiera Peterson, an 11-year-old girl, spent her birthday recounting the murder of her father. The 19-year-old man who allegedly perpetrated the shooting death of her father is accused of ordering a hit on Tashiera and her mother to keep them from testifying.
- Less than two weeks ago, six men firebombed a home of a community activist in Baltimore as retaliation for the woman informing authorities about drug trafficking in her neighborhood.

A prosecutor recounted before the Senate Judicial Proceedings Committee and the House Judiciary Committee a situation in which an individual awaiting trial had solicited others to "hit" eyewitnesses:

> [Adrian "Tony"] Jenkins was the only witness who would identify Andre Chavis, his eventual murderer, as the man who pulled the trigger [in another crime]. Over the course of the next 13 months, Chavis sent letters to other inmates and friends on the outside calling Tony a snitch and telling them to hide Tony and not let him come to court. . . . In May 2000, the State was forced to dismiss the case because Tony Jenkins did not appear in court and could not be found by police detectives. Eighteen months later he was dead, executed with one shot to the head by a gun fired by Andre Davis.
> There was one eyewitness to this murder, Noah Rich. Mr. Chavis had tried to kill Noah on the same December night he killed Tony, but his gun jammed and Noah was able to escape into the darkness and woods of Leakin Park. Within weeks of the State's disclosure of witnesses, Mr. Chavis was again writing letters asking for help in silencing Noah Rich. He solicited one of his associates to "hit" Noah.

Numerous witnesses also emphasized the 2002 firebombing of the home of Angela and Carnell Dawson, in which their five children and Mrs. Dawson were killed, because Mrs.

Dawson had repeatedly called police to report drug activity in their neighborhood. *See* Jeffrey Gettleman, *Fire Kills Mother and Children at Home*, N.Y. Times, Oct. 17, 2002, at A22, *available at* http://www.nytimes.com/2002/10/17/us/fire-kills-mother-and-children-at-home.html (last visited Mar. 4, 2015). Mr. Dawson later succumbed to his injuries from the fire. Tom Pelton et. al, *Man dies a week after fire at home*, Balt. Sun, Oct. 24, 2002, at 1A, *available at* http://articles.baltimoresun.com/2002-10-24/news/0210240250_1_dawson-family-dawson-died-coffins (last visited Mar. 4, 2015).

Faced with opposition due to the lack of evidentiary standards, the bills were amended to provide a clear and convincing standard and to require a hearing. In final passage, the hearsay exception required a finding that a party "has engaged in, directed, or conspired to commit wrongdoing":

> *(A) DURING THE TRIAL OF A CRIMINAL CASE IN WHICH THE DEFENDANT IS CHARGED WITH A FELONIOUS VIOLATION OF TITLE 5 OF THE CRIMINAL LAW ARTICLE OR WITH THE COMMISSION OF A CRIME OF VIOLENCE AS DEFINED IN § 14-101 OF THE CRIMINAL LAW ARTICLE, A STATEMENT AS DEFINED IN MARYLAND RULE 5-801(A) IS NOT EXCLUDED BY THE HEARSAY RULE IF THE STATEMENT IS OFFERED AGAINST A PARTY THAT HAS ENGAGED IN, DIRECTED, OR CONSPIRED TO COMMIT WRONGDOING THAT WAS INTENDED TO AND DID PROCURE THE UNAVAILABILITY OF THE DECLARANT OF THE STATEMENT, AS DEFINED IN MARYLAND RULE 5-804.*
> *(B) SUBJECT TO SUBSECTION (C) OF THIS SECTION, BEFORE ADMITTING A STATEMENT UNDER THIS SECTION, THE COURT SHALL HOLD A HEARING OUTSIDE THE PRESENCE OF THE JURY AT WHICH:*
> *(1) THE MARYLAND RULES OF EVIDENCE ARE STRICTLY APPLIED; AND*
> *(2) THE COURT FINDS BY CLEAR AND CONVINCING EVIDENCE THAT THE PARTY AGAINST WHOM THE STATEMENT IS OFFERED ENGAGED IN, DIRECTED, OR CONSPIRED TO COMMIT*

*THE WRONGDOING THAT PROCURED THE UNAVAILABILITY OF THE DECLARANT.*
*(C) A STATEMENT MAY NOT BE ADMITTED UNDER THIS SECTION UNLESS:*
    *(1) THE STATEMENT WAS:*
        *(I)    GIVEN UNDER OATH SUBJECT TO THE PENALTY OF PERJURY AT A TRIAL, HEARING, OR OTHER PROCEEDING OR IN A DEPOSITION;*
        *(II)    REDUCED TO WRITING AND SIGNED BY THE DECLARANT; OR*
        *(III)    RECORDED IN SUBSTANTIALLY VERBATIM FASHION BY STENOGRAPHIC OR ELECTRONIC MEANS CONTEMPORANEOUSLY WITH THE MAKING OF THE STATEMENT; AND*
    *(2) AS SOON AS IS PRACTICABLE AFTER THE PROPONENT OF THE STATEMENT LEARNS THAT THE DECLARANT WILL BE UNAVAILABLE, THE PROPONENT NOTIFIES THE ADVERSE PARTY OF:*
        *(I)    THE INTENTION TO OFFER THE STATEMENT;*
        *(II)    THE PARTICULARS OF THE STATEMENT; AND*
        *(III)    THE IDENTITY OF THE WITNESS THROUGH WHOM THE STATEMENT WILL BE OFFERED.*

2005 Md. Laws 2510-16. The law became codified as Section 10-901 of the Courts and Judicial Proceedings Article of the Maryland Code, which became effective October 1, 2005, (2005 Md. Laws 2516), and our Rule 5-804(b)(5)(B) was promulgated soon thereafter.[15]

Here, Judge Seaton found that on the morning after Mr. Duffy gave his statement, Smiley, "in the conversation with his mother . . . wanted to quote, 'get Mr. Duffy out of the picture,'" and even told his mother "quote, 'make sure they take care of everything,

---

[15] Maryland Rule 5-804(b)(5)(B) was enacted almost immediately after Section 10-905 became effective thereby codifying the exception to the hearsay rule, Maryland Rule 5-802 ("Hearsay rule"). 32 *Maryland Register* 1880 (Nov. 28, 2005); *see also* 155th Report of the Standing Committee on Rules of Practice and Procedure: Hearings Before the Court of Appeals (Nov. 7, 2005) (on file at the Court of Appeals).

Mom.'" Judge Seaton then found that "Mr. Duffy was murdered" and "that [the inmate's] testimony about the defendant's statements and his reaction to the news of Mr. Duffy's murder [was] credible"; those statements being that Smiley had told the inmate that Parker was involved with the murder and that Smiley was happy to hear of Mr. Duffy's death. Judge Seaton, finally, found that "Keith Parker ha[d] been charged with that murder" by taking "judicial notice of the case file in [the Circuit Court for Wicomico County], Case Number K12-0587 in which the murder charges [were] pending against Mr. Parker."

Judge Seaton determined that her findings supported the determination that Smiley had "engaged in, directed, or conspired to" Mr. Duffy's murder, based upon the clear and convincing standard. We agree.

Mr. Duffy's statement regarding Smiley's shooting of Green was properly admitted based upon Judge Seaton's findings derived from the evidence presented to her of Smiley's telephone calls seeking that "Heathcliff" prevent Mr. Duffy from attending trial; Mr. Duffy's murder; Smiley's reaction to hearing about Mr. Duffy's murder; as well as Keith "Heathcliff" Parker's indictment.[16] Judge Seaton's determination that the tenets of Section

---

[16] Smiley has challenged that there is nothing in the record connecting Smiley to Mr. Duffy's murder, because there was only a "proffer" of Parker's arrest. Judge Seaton, however, took "judicial notice of the case file in [the Circuit Court for Wicomico County], Case Number K12-0587 in which the murder charges [were] pending against Mr. Parker", which included an indictment for Mr. Duffy's murder. Judge Seaton properly took judicial notice of the Circuit Court file, because a court may take notice of its own records. *E.g. King v. State*, 400 Md. 419, 427, 929 A.2d 169, 174 (2007) ("The court then granted the State's request that the court take judicial notice of the court file in the underlying criminal case".).

22

10-901 and Maryland Rule 5-804(b)(5)(B) applied was based on clear and convincing evidence after a hearing.  As a result, Mr. Duffy's statement was properly admitted.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**